Lionel C. Epstein and Sarah G. Epstein v. Commissioner.
Epstein v. Commissioner
Docket No. 89681.
United States Tax Court
T.C. Memo 1963-259; 1963 Tax Ct. Memo LEXIS 85; 22 T.C.M. (CCH) 1296; T.C.M. (RIA) 63259; September 25, 1963
Burton L. Williams, 85 Devonshire St., Boston, Mass. and John M. Doukas, for the petitioners. W. Ralph Musgrove, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies of $39,347.18, $42,107.42, and $22,012.07 in petitioners' Federal income taxes for the years 1955, 1956, and 1957, respectively. The only *86 issue presented for our decision is whether petitioners are entitled to deductions for interest in the amounts of $76,200, $104,500, and $81,731.34 in the years 1955, 1956, and 1957, respectively. Other issues raised by the pleadings have been conceded by counsel for the petitioners at the trial. Findings of Fact The parties failed to enter into a stipulation of facts. The evidence consists of oral testimony and exhibits received at the trial. The petitioners, Lionel C. and Sarah G. Epstein, are husband and wife, presently residing in Washington, D.C. During the years here in issue the petitioners resided at 9 Holland Street, McLean, Virginia, and they filed joint Federal income tax returns for these years with the district director of internal revenue at Richmond, Virginia. The transactions here involved were entered into by or on behalf of Sarah G. Epstein, who will sometimes hereinafter be referred to as Sarah or petitioner. In these Findings of Fact and Opinion our use of "purchase," "sale," "loan," "interest," and corresponding terms is for convenience. It should be borne in mind, however, that our conclusion in this case is that petitioner has not proved that in substance *87 she purchased United States Treasury notes, borrowed funds, or paid interest on genuine indebtednesses within the meaning of section 163(a) of the Internal Revenue Code of 1954. Sarah's father, Clarence J. Gamble, a resident of Massachusetts, sometimes hereinafter referred to as Gamble, handled her business affairs by recommending investments and other procedures for enlarging her income. Gamble recommended that his daughter enter into several transactions involving United States Treasury notes. These transactions were handled by Gamble on behalf of his daughter. All correspondence involved was sent to Gamble, he kept the records involved in his files, and Sarah signed notes and gave directions for various transactions upon Gamble's recommendations. Arrangements for the transactions were made by Gamble with Simmons, Bourne & Co., note brokers, sometimes hereinafter referred to as Simmons Bourne, with offices located at 10 Post Office Square, Boston, Massachusetts. Gamble dealt with Standish Bourne at Simmons Bourne whom he had known prior to 1938 and through whom he had at one time borrowed money at favorable rates of interest. On September 15, 1955, Sarah *88 purportedly purchased United States Treasury notes in the face amount of $2,000,000, bearing interest at the rate of 1 7/8 percent, with a maturity date of February 15, 1959, and with February 15, 1957, and subsequent coupons attached. The purchase price was 95 1/4 flat, or $1,905,000. The purchase of the Treasury notes was purportedly financed by a lending organization known as Dartmouth Associates Trust, sometimes hereinafter referred to as Dartmouth Associates. Contact was made with Dartmouth Associates by Standish Bourne. Neither Gamble nor petitioner had personal contact with Dartmouth Associates. Sarah executed the following note to Dartmouth Associates, purportedly for the borrowing of money needed for the purchase of the Treasury notes: DUE Sept 15, 1956 $1,905,000.00 Boston, Mass., Sept. 15, 1955 ONE YEAR after date I promise to pay to DARTMOUTH ASSOCIATES TRUST, at its office, 10 Post Office Square, Boston, Mass., ONE MILLION NINE HUNDRED FIVE THOUSAND DOLLARS. together with interest at the rate of 4% per annum payable in advance, having deposited with the said Trust the following securities: $2,000,000 U.S. TREASURY 1 7/8s 2/15/59 The Trust shall have the *89 right to rehypothecate or to use the said securities for any different purposes while they are pledged to it. The undersigned shall not be called upon to furnish additional collateral at any time before the maturity of this note. At the maturity of this note, the undersigned shall have the right to order the sale of the securities held in pledge; the proceeds realized from the sale shall be applied to discharge the entire indebtedness of the undersigned. The undersigned shall not be liable for any deficiencies arising at the time of the sale or liquidation of the securities so held, and the Trust shall look only to the proceeds from such sale or liquidation for payment of this note. On each interest date the Trust shall credit the undersigned with interest from the coupons accruing to him on the bonds pledged as collateral. Sarah G. Epstein Address: 9 Holland St., McLean, Virginia. Neither Sarah nor anyone acting on her behalf ever had possession of any of the Treasury notes referred to herein, nor did they deposit (or instruct anyone else to deposit) any Treasury notes with Dartmouth Associates. Sarah gave her check dated September 27, 1955, in the amount of $76,200 *90 in favor of Sinumons Bourne, purportedly in payment of interest which was required to be prepaid to Dartmouth Associates for the loan of $1,905,000. Simmons Bourne executed a receipt in favor of Sarah for the $76,200 received as interest on the loan with Dartmouth Associates. The transaction was terminated on September 14, 1956, when the Treasury notes were purportedly purchased from petitioner by Dartmouth Associates for $1,985,000, plus interest in the amount of $3,125. The excess of the proceeds from the purported sale of the Treasury notes over the amount of Sarah's note due September 15, 1956, was remined to Gamble for his daughter Sarah by some person and in some manner not disclosed by the record. [1]
*91 Sarah entered into similar transactions upon Gamble's recommendations during the years 1956 and 1957. In September 1956 she purportedly purchased United States Treasury notes in the face amount of $2,750,000, bearing interest at the rate of 1 7/8 percent, with a maturity date in 1959, and with February 15, 1958, and subsequent coupons attached. The purchase price was to be $2,612,500, which Sarah purportedly borrowed from Dartmouth Associates. She executed a note, identical to the one executed in 1955 except for the dates, amounts, and description of the Treasury notes, purporting to borrow $2,612,500 from Dartmouth Associates to finance the purchase of the Treasury notes. Sarah gave her personal check dated September 17, 1956, in the amount of $104,500 in favor of Simmons Bourne in payment of interest which was required to be prepaid for the loan. Simmons Bourne executed a receipt in favor of Sarah for the $104,500 received as interest on the loan with Dartmouth Associates. Petitioner's return for 1957 reported the sale of these notes on September 17, 1957, for $2,722,500, with a resultant long-term capital gain of $89,375, of which one-half or $44,687.50 was returned as taxable *92 income. In November 1957 Sarah purportedly purchased United States Treasury notes in the face amount of $1,700,000 bearing interest at the rate of 2 1/8 percent, with a maturity date in 1960. The purchase price was to be $1,634,626.73 which Sarah borrowed from Dartmouth Associates. [2] She executed a note identical to those executed in 1955 and 1956 except for the interest rate, which was 5 percent, and except for dates, amounts, and descriptions of Treasury notes, purporting to borrow $1,634,626.73 from Dartmouth Associates to finance the purchase of the Treasury notes. Sarah gave her personal check dated November 20, 1957, in the amount of $81,731.34 [3] in favor of Simmons Bourne in payment of interest which was required to be prepaid for the loan. Each of the transactions involving the purchase *93 of United States Treasury notes in 1956 and 1957 was of 12 months' duration, at the end of which terms the Treasury notes were purportedly sold by or on behalf of Sarah and she purportedly received from someone and in some manner not disclosed by the record the difference between the purported proceeds of the sales and the settlement of the notes. At the time Sarah executed the notes in 1955, 1956, and 1957, purporting to borrow money for a period of 1 year from Dartmouth Associates, neither she nor Gamble received any currency or checks. Gamble and Sarah never received nor saw any United States Treasury notes which were purportedly purchased by Sarah. There is no evidence that Sarah was charged by or paid to Dartmouth Associates or Simmons Bourne any commissions or fees for the purported purchases and sales of United States Treasury notes. On September 22, 1955, Dartmouth Associates purchased from C. F. Childs and Company United States Treasury notes in the face amount of $2,350,000, of which $2,000,000 was allegedly for Sarah's account. The sale price to Dartmouth Associates for these Treasury notes was 97-7/64, or $2,282,070.31, plus interest in the amount of $3,711.79. This *94 price was higher than the cost of the Treasury notes to Sarah (95 1/4 flat). The confirmation slip on the sale of the Treasury notes from C. F. Childs and Company to Dartmouth Associates provided for delivery of the bonds on September 27, 1955, "at Chase Manhattan Bank a/c Cleveland Trust Co." In a letter from Dartmouth Associates to Gamble it is stated that the Chase Manhattan Bank paid for these bonds when they were delivered by C. F. Childs and Company. In their 1955 joint return petitioners reported adjusted gross income in the amount of $156,466.72. Petitioners' itemized interest expense deductions included $76,200, which amount was disallowed by respondent. In their 1956 joint return petitioners reported adjusted gross income in the amount of $168,326.54. Petitioners reported interest income from United States Treasury notes in the amount of $3,125, and capital gain in the amount of $65,000 [4] from the sale of United States Treasury notes in the face amount of $2,000,000. A deduction for interest expense in the amount of $104,500 was claimed. Respondent decreased petitioners' interest income and capital gain in the above-stated amounts and disallowed the interest expense deduction *95 claimed. In their 1957 joint return petitioners reported adjusted gross income in the amount of $197,761.63. Petitioners reported interest income from United States Treasury notes in the amount of $4,623.82, and capital gain in the amount of $89,375 from the sale of United States Treasury notes in the face amount of $2,750,000. A deduction for interest expense in the amount of $82,265.82 was claimed. Respondent decreased petitioners' interest income and capital gain in the above-stated amounts and disallowed the interest expense deduction claimed. Petitioner has not proved that she realized any capital gains as a result of these purported transactions. Petitioner did not pay any interest on indebtedness to Simmons Bourne or Dartmouth Associates in 1955, 1956, or 1957. Opinion KERN, Judge: The only issue presented for our decision is whether the amounts designated as interest and paid by petitioner to Simmons Bourne in each of the years 1955, 1956, and 1957 are deductible as interest under section 163(a) of the Internal Revenue Code of 1954. [5]
*96 Petitioner argues that bona fide transactions were entered into for the purchase of United States Treasury notes, that money was borrowed through Simmons Bourne for such purchases, and that interest was prepaid on the transactions for which deductions are allowable pursuant to section 163(a) of the Internal Revenue Code of 1954 and L. Lee Stanton, 34 T.C. 1. Respondent argues that petitioner never in fact became indebted in any of the transactions in question, and accordingly the payments designated as interest do not constitute allowable deductions within the meaning of section 163(a) of the Internal Revenue Code of 1954. Respondent additionally argues that the claimed deductions are not allowable for the reasons that the transactions "were completely lacking in substance and had no commercial or economic reality, but were only sham transactions entered into for tax avoidance purposes." Accordingly, respondent not only has disallowed the deductions claimed by petitioner for interest, but he has eliminated from petitioner's income the capital gain and interest income reported from the transactions, as well. Section 163(a) provides for the deduction *97 from gross income of all interest paid or accrued on indebtedness. [6] The Supreme Court has construed the term interest on indebtedness to mean "compensation for the use or forbearance of money," Deputy v. duPont, 308 U.S. 488, 498; and "the amount which one has contracted to pay for the use of borrowed money." Old Colany R. Co. v. Commissioner, 284 U.S. 552, 560. It is petitioner's burden to prove that the transactions she entered into did have substance, namely, that actual purchases and sales of United States Treasury notes were made, that bona fide loans were made to finance such purchases, and that petitioner actually paid interest within the meaning of the statute. This Court and others have found many times in the past, with respect to transactions similar to those entered into by petitioner, that such transactions, if not bona fide and actually carried out but existing only on paper and lacking substance, must be totally disregarded for purposes of Federal income taxation. *98 See Eli D. Goodstein, 30 T.C. 1178, affd. 267 F. 2d 127; Broome v. United States, 170 F. Supp. 613; Sonnabend v. Commissioner, 267 F. 2d 319, affirming a Memorandum Opinion of this Court; George C. Lynch, 31 T.C. 990, affd., 273 F. 2d 867; Leslie Julian, 31 T.C. 998, affirmed sub nom. Lynch v. Commissioner, 273 F. 2d 867; Egbert J. Miles, 31 T.C. 1001; Becker v. Commissioner, 277 F. 2d 146, affirming a Memorandum Opinion of this Court; Morris R. DeWoskin, 35 T.C. 356; Perry A. Nichols, 37 T.C. 772, affd. 314 F. 2d 337; Joseph H. Bridges, 39 T.C. 1064; Carl Shapiro, 40 T.C. 34, on appeal (C.A. 1, Aug. 19, 1963); Rubin v. United States, 304 F. 2d 766; and Jockmus v. United States, - F. Supp. - (D. Conn., July 22, 1963). The meager facts established by petitioner in this case do not distinguish it in principle from the above-cited cases. The most apparent difference is that in this case petitioner seems to have expended less effort in attempting to prove that what appeared *99 to be done actually was done. The record before us fails to justify a conclusion that the transactions involved were not shams or had commercial reality. On September 15, 1955, petitioner purportedly purchased United States Treasury 1 7/8 percent notes in the face amount of $2,000,000, with a maturity date of February 15, 1959, and with February 15, 1957, and subsequent coupons attached. The purchase price was $1,905,000, which was allegedly loaned to petitioner by Dartmouth Associates. Petitioner gave Dartmouth Associates a note dated September 15, 1955, due 1 year after date in the amount of the loan. The Treasury notes were purportedly pledged as collateral with Dartmouth Associates which had the right to rehypothecate or use the securities for any purpose. Dartmouth Associates could look only to the proceeds from the sale of the securities for payment of the note, and petitioner could not be required to put up any additional collateral for the alleged loan. On September 14, 1956, Dartmouth Associates purportedly purchased from petitioner the $2,000,000 face amount Treasury notes at 99 1/4 flat, or $1,985,000, plus interest from August 15 to September 15, 1956, in the amount of *100 $3,125. On her 1955 return petitioner deducted the alleged interest paid in the amount of $76,200, and on her 1956 return she included in income interest in the amount of $3,125 and capital gain in the amount of $65,000. In 1956 a similar transaction was entered into whereby 1 7/8 percent Treasury notes due in 1959 in the face amount of $2,750,000 were purportedly purchased for $2,612,500, which latter amount was purportedly borrowed from Dartmouth Associates upon prepayment of interest in the amount of $104,500. In 1957 the transaction was again entered into whereby 2 1/8 percent Treasury notes due in 1960 in the face amount of $1,700,000 were purportedly purchased for $1,634,626.73, which latter amount was purportedly borrowed from Dartmouth Associates upon the prepayment of interest in the amount of $81,731.34. With respect to these transactions the only documents received in evidence are the nonrecourse notes executed by petitioner, her canceled checks for the interest payments made, and a receipt from Simmons Bourne acknowledging the payment of interest by petitioner in 1956. Neither petitioner nor her father, who dealt with the note brokers on her behalf, ever had possession *101 of the Treasury notes. There is no evidence in the record to indicate that Dartmouth Associates or Simmons Bourne had possession of the Treasury notes purportedly deposited by petitioner with Dartmouth Associates as security for her promissory notes. With respect to the year 1955, the record indicates that C. F. Childs and Company delivered bonds purchased by Dartmouth Associates to the Chase Manhattan Bank for the account of the Cleveland Trust Co. We are not advised how this transaction represents a purchase of bonds for petitioner's account. The fact that the sale price of the Treasury notes to Dartmouth Associates from C. F. Childs and Company exceeded the sale price of the Treasury notes purportedly sold by Dartmouth Associates to petitioner indicates that no purchase was made for petitioner's account. No funds purportedly loaned to petitioner were ever received by petitioner or by Gamble on petitioner's behalf. There is no evidence to indicate that the note brokers received the proceeds of such loans, nor is there any evidence that Dartmouth Associates had funds with which to make the loans. No attempt was made to demonstrate how petitioner, who did not have any Treasury notes, *102 sold them 1 year after each purported purchase. No representative of the note brokers or Dartmouth Associates appeared as a witness. Viewing the record as a whole petitioner has not proved that she purchased Treasury notes in each of the years 1955, 1956, and 1957, that actual loans were made to petitioner for which she paid interest, and that she subsequently sold Treasury notes 1 year after each purported purchase. We cannot conclude on the basis of the evidence presented that the amounts petitioner paid were for the use or forbearance of money. The instant case is distinguishable from L. Lee Stanton, supra, upon which petitioner relies. There the Commissioner conceded the reality and validity of the transactions involved. In that case there was no collusion; the lenders actually advanced the money for the petitioner's use which was used in the outright purchase of securities at market. The securities purchased became petitioner's property and were held as collateral by the lenders of the money. The petitioner had all the benefits and risks of ownership. Under these circumstances we concluded that the borrowings involved therein were genuine and resulted in real indebtedness *103 within the meaning of section 23(b) of the Internal Revenue Code of 1939. The record before us does not support any finding that petitioner entered into the transactions here involved for the purpose of realizing any economic profit other than the obtaining of a tax deduction. In fact the evidence persuades us, to the contrary, that the transactions were engaged in for the sole purpose of creating a tax benefit. Respondent argues that therefore, regardless of the economic reality of the transactions, no interest paid in connection with them is deductible. See George C. Lynch, supra, and Egbert J. Miles, supra.
We have found that petitioner has not established that in substance she purchased Treasury notes, borrowed funds to finance such purchases, and paid interest on genuine indebtednesses which is deductible within the meaning of section 163(a) of the Internal Revenue Code of 1954. Accordingly, we have held that the transactions should be disregarded for purposes of Federal income taxation, and it is not necessary for us to decide whether petitioner would be entitled to the claimed deductions if the transactions (even though having *104 economic reality) had no business purpose but were entered into for the sole purpose of securing a tax deduction. See Joseph H. Bridges, supra at 1076, footnote 8. Petitioner appears to argue on brief that even if in fact the transactions involved were shams, the interest deductions should not be denied to her because she was not knowingly a party to the sham dealings. Interest deductions are allowable only for interest paid or accrued on genuine indebtednesses. If such are lacking, the taxpayer's good faith, innocence, or intent to have paid interest on indebtednesses are of no avail. See Lynch v. Commissioner, supra at 872; Gordon MacRae, 34 T.C. 20, 28, affirmed on this point 294 F. 2d 56, 59; Perry A. Nichols, 37 T.C. 772, 788, 789, affirmed on this point 314 F. 2d 337, 338. We hold that petitioner has not shown that the transactions involved herein had substance. Accordingly, respondent has not erred in disregarding the transactions for tax purposes. The amounts designated as interest and paid by petitioner to Simmons Bourne in each of the years 1955, 1956, and 1957 are not deductible as interest *105 within the meaning of section 163(a) of the Internal Revenue Code of 1954. Decision will be entered for the respondent. Footnotes
1. On schedule D of petitioner's 1956 return the sale price of $2,000,000 face amount of Treasury notes was reported as $1,970,000, cost was reported as $1,905,000, and capital gain was reported in the amount of $65,000, of which one-half or $32,500 was reported as taxable income. The sales confirmation slip from Dartmouth Associates indicates that the sale price of the Treasury notes was $1,985,000 which would result in a capital gain in the amount of $80,000. This discrepancy is not explained in the record.↩
2. The amount of the loan appears on exhibit 7-G in numerals as $1,634,626.73. In the same exhibit the amount of the loan appears in writing as $1,634,620.73. This discrepancy is not explained in the record. ↩
3. Petitioner deducted on her 1957 return $82,265.82 as interest paid. On brief, however, petitioner contends she is entitled to an interest deduction in the amount of $81,731.34.↩
4. See footnote 1.↩
5. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
6. The limitations on deductions for interest found in sections 264 through 267 of the Internal Revenue Code of 1954↩ are not applicable to this case.